IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KELLI HARRIS,                              )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )        Civil Action No.  2:07-cv-349-WHA
                                           )                        (WO)
THE CITY OF PRATTVILLE, et al.,            )
                                           )
                    Defendants.            )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by Defendants City of Prattville ("Prattville") and Prattville Chief of Police Alfred Wadsworth ("Wadsworth") (Doc. # 29), as well as a Motion for Partial Summary Judgment filed by Defendant Corporal R.H. Davis ("Davis"). (Doc. # 26).

Plaintiff Kelli Harris ("Harris") brought suit under 42 U.S.C. § 1983 against the City of Prattville and against Wadsworth and Davis in their individual capacities, alleging that Davis violated her Fourth and Fourteenth Amendment rights to be free from excessive force and unreasonable seizure (Count I), that Prattville, through its final policy maker, Wadsworth, violated her Fourth and Fourteenth Amendment rights by a failure to train or supervise subordinates, and by having a policy or custom that encourages excessive force (Count II), and that Wadsworth violated her Fourth and Fourteenth Amendment rights by failing to properly supervise Davis and subordinates (Count III).  Finally, Harris added to her federal claims against

Davis three state law claims of malicious prosecution[1], false imprisonment, and assault and battery. (Counts IV-VI.)  Prattville and Wadsworth moved for summary judgment on all claims, whereas Davis moved for partial summary judgment on the claims of malicious prosecution (Count IV), false imprisonment (Count V), and the unreasonable seizure claim included in Count I.  Davis did not move for summary judgment on the excessive force claim contained in Count I or the assault and battery claim (Count VI).

For the reasons to be discussed, Prattville's and Wadsworth's Motion for Summary Judgment is due to be GRANTED, and Davis's Motion for Partial Summary Judgment is due to be DENIED.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[1]   In Count IV of her Complaint, Harris complains about *Davis* charging her maliciously and "without arguable probabl[e] cause." (Compl. ¶¶ 33-36.)  The final paragraph of Count IV, however, demands judgment against *Wadsworth*, without any alleged basis for Wadsworth's liability for malicious prosecution.  (Compl. ¶ 37.)  Also, Harris says in her response that she intended to allege the claim against Davis and not Wadsworth. (Br. in Resp. at 29.)  Because a plaintiff may not allege one defendant's liability for a particular claim and then seek damages from a completely separate defendant without alleging how the second defendant is responsible, and because Harris clarifies in her response brief that the malicious prosecution claim is against Davis (Br. in Resp. at 29), the court will construe ¶ 37 as a typographical error, and will construe Count IV as a claim of malicious prosecution against Davis, and therefore seeking damages from Davis.  Davis has made the same assumption in arguing for summary judgment on the claim.

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## III.  <u>FACTS</u>

The court has reviewed the submissions of the parties and the evidence submitted against and in support of their respective positions, and considers the following facts, viewed in a light most favorable to Harris:

On June 8, 2006, Harris and her husband, Kenneth Ray Harris, were at home when they began arguing over going out to eat. (Harris. Depo. 147:16-148:3.)  The argument had subsided, and Harris was holding a lamp in her hand as she cleaned her night stand, when her husband entered the room and said something to Harris. (Harris Depo. 148: 8-12.)  Turning to face her husband, Harris accidentally swung the lamp into the window, shattering the window as glass fell onto her mattress. (*Id.*). Harris began crying because the window was broken and her father was due to arrive soon. (Harris Depo. 148:14-17.)

Harris's son, Kory Rotton ("Rotton"), had previously called Harris during her argument when she was crying. (Harris Depo. 152:9-12; 154:10-15.)  When Rotton arrived home, seeing the broken glass and knowing his mother had been crying, he mistakenly concluded that Kenneth Ray Harris had been hitting his mother, and walked across the street to a neighbor's yard to call the police. (Harris Depo. 159:17-18.)

Soon after Rotton's call, Investigator Timothy Hope ("Hope") and Sergeant J.S. Hassell ("Hassell") of the Prattville Police Department were dispatched to the Harris residence. (Aff. Hope ¶ 5.)  En route, Hope was told by the dispatcher that there were warrants out for the arrest of an individual by the name of "Kenneth Ray"[2], and that this individual was possibly at the residence.  (*Id.* ¶ 6; Davis Aff. ¶ 6)  When Rotton told Harris

---

[2] *But see infra* note 3.

the police had arrived, Harris went outside to meet them. (Harris Depo. 162:1-8.)  The

officers said, "Where is your husband," to which Harris replied, "He didn't hit me." (*Id.*)

The officers said, "We are not here for that.  We are here for something else," (*id.*), but did

not tell Harris their reason for being there.  (*Id.* 162:17-20.)  Hope and Hassell went around

the side of the house where Kenneth Ray Harris was masking a broken window with plastic.

(Hope Aff. ¶ 8.)  As Kenneth Ray Harris turned towards the officers, Hope saw that he had a

box-cutter in his hand. (*Id.*)   Hope ordered him to drop the box-cutter, but Kenneth Ray

Harris hesitated, at which time the officers handcuffed and detained him. (*Id.*)  By the time

Harris saw Hope and Hassell bring Kenneth Ray Harris around the house in handcuffs, Davis

and Officer Ron Champion ("Champion") had arrived. (Harris Depo. 163:8-12.)

    Davis came up to speak with Harris and informed her that they had warrants on a

"Kenneth Ray"[3] for tickets; Harris replied that it was impossible, that her husband's name was

"Kenneth Ray Harris," and that he had just had his license upgraded with the Department of

Defense. (Harris Depo. 163:19-23;164:1-23.)  Harris asked Davis if she could retrieve her

husband's driver's license and all from the car to show him, that "his DOD badge is in the car,

his driver's license is in the car, his statement from where he just upgraded his hazmat where

---

    [3] The Plaintiff's Response brief states that "Davis was telling her that his name was
Kenneth Ray, and would not let her get the driver's license out of the car." (Pl.'s Resp. at 3
(*citing* Harris Depo. 163:19-23; 164:1-23.)  None of the evidence cited, however, says that the
police had a warrant on a "Kenneth Ray"; Harris's deposition only said that Ray told her he had
warrants on her husband, and she was arguing his name was Kenneth Ray Harris.  Both Hope
and Davis's affidavits say they had warrants on "Kenneth Harris." (Hope Aff. ¶ 6; Davis Aff. ¶
6.)  The court concludes that Harris has provided sufficient evidence that the police were
confused or mistaken or misinformed about the name of the individual with warrants, and that
Harris wanted to provide the documentation to clarify this confusion.

you have to be certified to be . . . you know, for the hazmat tanker," but Davis told her no. (*Id.* 164:2-16.)

As Harris's husband sat handcuffed in the police car, and Davis continued to refuse to allow Harris to obtain his proof of identity from the car, Harris grew angry and argued with Davis, "screaming profanities and obscenities, and . . . [seemingly] . . . disturbed." (Davis Aff. 12; Hope Aff. ¶ 12.)  Davis "instructed Ms. Harris to . . . go inside the residence." (Davis Aff. ¶ 12.)[4]  Harris was told at least once, although she denies being told several times, to go in the house or that he would have to arrest her. (Harris Depo. 181:17-23.)  Harris stated, "I am going," and headed towards the door; as she went to shut the door as she entered the house, she said to Davis, "F— you," because he would not let her prove the officers' mistaken identity problem. (Harris. Depo. 180: 4-23; 181:1.)[5]  Around three to five minutes later, after Harris had time to use the restroom and was trying to call her father, she heard beating on the door. (Harris Depo. 185:5-17.)   She attempted to unlock the door, but it kept

---

[4] Davis claims that he told Harris to either stop cursing or go inside the residence.  Harris denies, however, having been told to stop cursing or, having been told several times to go in the house. She states that Davis never placed her under arrest before she went into the house. (Harris Depo. 180:1-18; 181:14-23; 182:7-21.)  Because, for purposes of summary judgment, any factual disputes are resolved in favor of the non-movant, the court must adopt Harris's version of the facts.

[5] According to Davis, he told her to calm down or go inside the house, to which Harris replied, "Go f— yourself!" (Davis Aff. ¶ 12.)  Again, according to Davis, he ordered her to either calm down or go inside, to which she exclaimed, "I'll stand here and curse all I f—ing want." (*Id.*)  A third time, Davis ordered Harris to go inside the residence or she would be arrested. (*Id.*) Harris yelled that Davis was a "f—ing prick." (*Id.*)  At that time, according to Davis, he advised Harris that she was under arrest for disorderly conduct. (Davis Aff. ¶ 13.)  The court, however, is not permitted to consider Davis's version of the events, which is different from Harris's, in resolving the pending motions for summary judgment.

jarring because of the beating. (*Id.* at 185:9-12.)   When she saw the door begin to give, Harris moved out of the way. (*Id.* at 186:3-6.)

As the door burst open, Davis leapt onto Harris's back and tackled her, snapping her ankle in the process. (Harris Depo. 191:23-193:2.)  Harris cried out, "[Y]ou've broke my leg; you've broke my leg." (Harris Depo. 193:1-3.)  Harris's head hit the table, and her chin hit the carpet. (Harris Depo. 197:4-198:15.)  Davis had his full weight on top of Harris, with one knee on her neck and the other on her back, so that she could not see anything but the floor. (Harris Depo. 196:13-20; 198: 12-17.)  As Harris tried to breathe, Davis said, "[D]on't try to bite me," to which Harris replied that she was trying to breathe, and turned her head. (Harris Depo. 198:12-19.)  When she did so, Davis hit her with his fist, at which point "everything went black." (Harris Depo. 198:19-22.)  Harris claims that she would occasionally get her vision back and could hear things off and on, but just could not see. (Harris. Depo. 198:22-199:1.)

While on top of Harris, Davis took Harris's left hand behind her back and began to handcuff her. (Harris Depo. 201:23-202:1.)  Harris told Davis not to put her hands behind her back because she had had several shoulder surgeries and that handcuffing her behind her back would rip her shoulders out of socket. (Harris Depo. 202:1-6.)  Davis told her to shut up, and hit her again in the face. (Harris Depo. 204: 1-5.)  After repeated hits, she "couldn't see anything more, period." (Harris. Depo. 205:6-10.)  The two officers handcuffed her behind her back.

Later, Hassell, Officer A.A.Shanks ("Shanks")[6], and Rotton came in and stood in the kitchen. (Harris Depo. 205:22-23; 213:1-18.)  Shanks asked, "Ron, what are you doing to her?" (Harris Depo. 214:4-13.)  Davis replied that Harris was resisting arrest, and Shanks said, "Kelli, don't make me tase you." (*Id*.)  Harris replied to Shanks, "[N]o I'm not; he just beat the hell out of me; help me, please; help me." (*Id*.)  The two officers pulled Harris up to her knees by her wrists and cuffs, and one of the handcuffs fell off of her right hand. (Harris Depo. 215:7-15.)  When she held her hands up, Davis kicked her in the thigh with his boot and punched her in the head, until Shanks said, "hold on, she's trying to show you that it fell off," and began to reattach the handcuffs. (*Id*. at 216:13-22.)  Again, Harris pleaded for the officers to put her handcuffs in the front, but again they cuffed her in the back, where she remained cuffed until the paramedics arrived and Harris was put on the gurney and cuffed to the rail. (*Id*. at 216:22-217:11.)[7]

---

[6] The parties' briefs do not cite any direct testimony from Officer Shanks, but Davis's statement to Wadsworth mentions that "Off. A.A. Shanks arrived on the scene and assisted in handcuffing Harris," (Wadsworth Exh. 6, Doc. # 44-6, at 2), and Harris's deposition states that at one point Hassell came in with her son, and later says that Shanks had come in as she was lying on the floor, although she only knew it was Shanks from reading the report. (Harris Depo. 205:22-23; 213:1-12.). Harris states that "[n]o one ever else came in that house except my son and Hassell and Shanks." (Harris Depo. 213:10-11.)

[7] Several other disputed facts are alleged involving occurrences in the hospital between the Prattville police, Harris, and Kenneth Ray Harris, ultimately ending up in the police using a Taser on Kenneth Ray Harris at the hospital. (*See* Br. in Opp. at 9-10.)  Because this incident occurred after the arrests in question, and because the defendants do not move for summary judgment on the excessive force claim, they are not relevant to the instant motion, and are therefore not recounted here.

Following the incident at the house, Harris was charged with resisting arrest and disorderly conduct. (Compl ¶ 14; Answer ¶ 14.)  The charges were adjudicated in municipal court, and Harris was found not guilty. (*Id.*)  On April 25, 2007, Harris filed the instant suit.

## IV. <u>DISCUSSION</u>

First, the City of Prattville moves for summary judgment with respect to any liability for Harris's claims that it has a policy, established by its final policy maker, Chief Wadsworth, that encourages excessive force and does not properly train or supervise its police officers with respect to using excessive force (Count II.).  Second, Wadsworth similarly moves for summary judgment with respect to any liability in his individual capacity for his role as final policy maker for the City of Prattville for a failure to properly train or supervise police officers. (Count III).  Third, Davis moves for partial summary judgment with respect to liability in his individual capacity for Harris's federal claim of unreasonable seizure (Count I) and her state law claims of malicious prosecution (Count IV) and false imprisonment (Count V).

## A. Claim against City of Prattville (Count II)

Local governments may not be held liable for their employees' torts on a *respondeat superior* basis, but rather only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Sometimes, municipal liability may be premised not on an *affirmative* or express policy or decision, but rather the *absence of* or refusal to adopt a municipal policy or decision to prevent known and likely constitutional violations.  In these "inadequate policy" cases, such as a failure-to-train claim, for example, "the inadequacy . . . may serve as the basis for § 1983 liability only

9

where the failure to train amounts to *deliberate indifference* to the rights of persons with whom

the police come into contact." *City of Canton v. Harris*, 489 US. 378, 388-89 (1989)(emphasis

added).  "The 'deliberate indifference' standard . . . does not turn upon the degree of fault (if

any) that a plaintiff must show to make out [the] underlying claim of a constitutional violation."

*Id.* at 388 n.8.  Instead, "[i]f a program does not prevent constitutional violations, municipal

decision makers may eventually be put on notice that a new program is called for," and their

"continued adherence to an approach that they know or should know has failed to prevent

tortious conduct by employees may establish the . . . 'deliberate indifference' . .  necessary to

trigger municipal liability." *Bd. of Cty. Comm'rs. v. Brown*, 520 U.S. 397, 407 (1997) (citations

omitted).  Such circumstances, however, are limited, and the degree of causation required is

strict, for fear of sliding towards a mere "but for" requirement and thus collapsing municipal

liability into *respondeat superior* liability where, for example, the plaintiff would have suffered

no injury had the offending employee not been hired. *Id.* at 410; *Canton*, 489 U.S. at 391-92 ("In

virtually every instance where a person had had his or her constitutional rights violated by a city

employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to

prevent the unfortunate incident." ).

Therefore, if a municipality has no notice of the need to train or supervise in a particular

area, it cannot be liable as a matter of law for any failure to train or supervise. *Wright v.

Sheppard,* 919 F.2d 665 (11th Cir. 1990) (holding sheriff's department not liable for deputy's

acts when no evidence of a history of widespread prior abuse put the sheriff on notice of the need

for improved training or supervision); *Popham v. City of Talladega*, 908 F.2d 1561 (11th Cir.

1990) (finding no liability for failure to train when no pattern of incidents put city on notice of a

need to train).  Here, other than a previous juvenile choking incident involving Davis, Harris has
provided no evidence of a widespread pattern of excessive force incidents or complaints that
would put Prattville or Chief Wadsworth on *actual* notice of the need to implement a more
adequate policy of training  and monitoring to prevent excessive force among its officers.  Any
claim of liability, therefore, would have to be premised upon *constructive* notice – the narrower
possibility that, even in the absence of a pattern of constitutional violations, "a violation of
federal rights may be a highly predictable consequence of the failure to equip law enforcement
officers with specific tools to handle recurring situations." *Gold v. City of Miami*, 151 F.3d 1346,
1352 (11th Cir. 1998) (*quoting Brown*, 520 U.S. at 409).  The only Supreme Court example of
such a need to train being sufficiently "obvious" that a widespread historical pattern of violations
was unnecessary to find "deliberate indifference" was the *Canton* hypothetical in footnote 10,
where "the need to train officers in the constitutional limitations on the use of deadly force" was
"'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to
constitutional rights," given that city policymakers had knowingly armed officers with firearms
partly to aid them in arresting fleeing felons. *Canton*, 489 U.S. at 390 n.10.

  Prattville and Wadsworth argue that there is insufficient evidence of any "policy" or
"custom" that was the moving force behind the alleged constitutional deprivation, or any "direct
causal link" between the policy and the constitutional deprivation. (Br. in Supp., Doc. # 29 at 6-
7.)  The officers are "trained in the proper use of the minimum amount of force necessary, and
further instructed in 'communications with the public.'" (Def.'s Exh 2, Doc. 29-3.)  Department
officers are required to attend a minimum of 48 hours of continuing education each year, which
is four times the annual minimum required by law. (Wadsworth Depo. 33:11-12.)  Prattville and

Wadsworth argue that it does not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particularly injury-causing conduct . . . [but] . . . for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." (Br. in Supp. at 9 (*quoting Canton,* 489 U.S. at 390).)  Prattville and Wadsworth argue that Harris has failed to identify any such specific deficiency in their training program related to Davis's allegedly wrongful conduct. (Br. in Supp. at 9.)

        With respect to Davis in particular, Wadsworth testified that he did not remember doing anything to retrain Davis or to move him or take any correctional action after his suspension for choking a juvenile, although the mayor did suspend Davis for three days afterward; Wadsworth testified that it was the mayor's "job to issue out discipline and not [his]."  (Wadsworth Depo. 57:6-11; 63:14-20.)  There would also not be anything in Davis's file, to Wadsworth's knowledge, that would indicate what additional corrective action, in terms of retraining or additional discipline, was taken after the choking incident and the three day suspension. (*Id.* at 57:6-61:4.)[8]  During the investigation of Harris's complaint, however, he was placed on the desk, and moved to the third shift in order to avoid any possible meetings between Davis and Harris pending the investigation. (*Id.* at 56:18-23.)

        Harris also argues that "there was no procedure for how complaints by citizens were dealt with in the Department." (Br. in Resp. at 16.)  Wadsworth testified that complaints concerning

_____

        [8]  When asked whether there was "anybody else with the department that . . . could tell me definitively one way or the other whether anything at all was done to deal with [Davis's conduct] after he came back from being suspended," Wadsworth replied that his shift supervisors would know, but could not say who his shift supervisors were in 2002 nor was there any record of who they were. (Wadsworth Depo. 60:10-21.)

police officers do not necessarily come through his office, but that "[a]ny supervisor or any commander on any shift can take a complaint and look into it," without ever notifying him. (Wadsworth Depo. 7:12-20.)  If an excessive force complaint is made, it would only be forwarded to Wadsworth if the accused officer's shift supervisor, after investigating the complaint, decided that excessive force *was* used; if he decided otherwise, Wadsworth might not ever hear about it. (*Id.* at 8:10-18.)  Instead of a central file holding all complaints or all excessive force complaints, the excessive force claims are kept in each individual officer's personnel file; therefore, if someone asked to see all excessive force complaints, founded or unfounded, there would be no central place to look. (*Id.* at 7:21-23; 9:9-18.)  Wadsworth testified that he has no "way of knowing at any particular time during the year how many excessive force claims [have been] made against [his] department." (*Id.* at 10:19-22.)  He further testified that there was no way to check on citizen complaints other than to go through each individual personnel file of approximately 79 officers. (*Id.* at 29:20-30:1)  If one officer was using more force than other officers, Wadsworth testified that he would have no way of knowing. (*Id.* at 52:3-6.)

Harris's claim of municipal liability based on a policy, custom, or practice established by its final policy maker, Chief Wadsworth (Count II), is two-pronged: that there is inadequate training as to excessive force, and that officers with violent propensities are not disciplined and are allowed to continue without adequate supervision.[9]

*1. Failure to train*

---

[9]  Count II also alleges that "officers with violent propensities are hired," but no evidence of that has been submitted.

13

One of Harris's arguments of municipal liability is based on a failure to train, claiming that "absent this failure to train or incorrect training, the Plaintiff would not have been subject to the unreasonable seizure and excessive force committed by Ron Davis." (Resp. Br. at 31.)  As evidence of inadequate discipline or training, she cites the officers' inability to recite the correct elements of disorderly conduct, the fact that Wadsworth did not broadcast the discipline of one officer to the rest, "tantamount to letting them believe such conduct is acceptable," (Resp. Br. at 33.), and Davis's mere 3- day suspension, followed by a promotion.

This court finds Harris's argument unconvincing.  Harris has not shown a lack of adequate discipline to the extent that it constitutes a "deliberate indifference" to a risk that constitutional violations are "substantially certain to result. . . . ." *Canton*, 489 U.S. at 396. Aside from the promotion, the record reflects that all incidents of misconduct cited in the record were answered with some form of discipline - in one case a written reprimand, and in the other, a three day suspension.  Failure to give "perfect, horn book definitions" of disorderly conduct is not necessarily inadequate training. *Payne v. DeKalb Cty.,* 414 F. Supp.2d 1158, 1181 (N.D. Ga. 2004).  There are several valid reasons not to broadcast discipline among officers, and alternative ways to advise officers that certain conduct is punishable.  Disciplinary and training policies were in place, and even if they were not as good as they should have been, it does not suffice to simply prove that an injury or accident could have been avoided if an officer had received better instruction or discipline. *See Canton*, 489 U.S. at 392 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").

14

The court therefore holds that Prattville may not incur municipal liability based on Harris's failure to train argument.

2. *Failure to supervise.*

Harris's second argument is based not so much on inadequate training or discipline, but rather on a systemic failure to know *when* such training or discipline of officers is warranted, either individually or collectively.  In other words, Harris bases this theory on the fact that there is no central file system for logging excessive force complaints, as complaints are only stored individually in each officer's file; therefore, there is no way to check on citizen complaints other than to rifle through each of the seventy-nine files. (Wadsworth Depo. at 29:20-30:1.)  As discussed above, complaints are handled by the individual shift supervisors, and *if* they determine that no excessive force was used, then Wadsworth and the mayor may never know about them at all. Wadsworth further testified that he has no "way of knowing at any particular time during the year how many excessive force claims [have been] made against [his] department." (*Id.* at 10:19-22.)  In the few cases when an officer is disciplined by the Mayor, Wadsworth again keeps no central file, but rather files the document in the individual officer's file. (Wadsworth Depo. 28:18-22.)[10]  As Harris argues in her brief, Wadsworth ultimately "has no way, other than his memory, to determine what officers have been disciplined, for what, and how many times." (Br. in Resp. at 35-36 (*citing* Wadsworth Depo. 28:18-23; 29:7-23; 30:1)).

---

[10]   The mayor is the sole dispenser of discipline due to the terms of a previous federal lawsuit. (Wadsworth Depo. 25:8-26:6.)  In the event that a shift supervisor decides "there's any validity to [a complaint] at all" and notifies Wadsworth, Wadsworth has the discretion to fill out an incident report and send it to the Mayor for a disciplinary hearing (Wadsworth Depo. 27:21-28:11.)  Again, however, there is no central file for keeping track of such documentation other than each individual personnel file.

As an example of inadequate recordkeeping amounting to deliberate indifference, Harris

cites *Vineyard v. Cty of Murray, Ga.,* where the Eleventh Circuit affirmed the district court's

refusal to direct a verdict in favor of the plaintiff, holding that "the Sheriff's Department had

inadequate procedures for recording and following up complaints against individual officers."

990 F.2d 1207, 1212 (11th Cir. 1993).  In *Vineyard,* the Murray County sheriff's department did

not log complaints, had no policies and procedures manual, and complaints were handled at the

discretion of the "dispatcher or whoever answers the telephone . . . ." *Id.*  In the specific

excessive force incident in *Vineyard*, the county sent the two accused officers out to investigate

the incident and interview witnesses. *Id.*  No one completed a police report describing the

circumstances of Vineyard's arrest. *Id.*  Under the circumstances, the *Vineyard* court found

"substantial evidence supporting the jury's conclusion that Murray County had inadequate

policies of supervision, discipline, and training of deputies . . . [that] . . . demonstrated the

deliberate indifference of the County to the rights of arrestees to be free from the use of

excessive force by the County's deputies." *Id.*

This court agrees with Prattville, (Reply Br. at 5), that the *Vineyard* case is limited to its

own facts, which this court also agrees were more egregious than the facts in this case. In

*Vineyard*, there was no policies and procedure manual, whereas Prattville has a field training

manual that all officers must complete, and a training file where all such training certificates are

kept. (Wadsworth Depo. 22:19-24:16.)  In *Vineyard*, citizen complaints were handled under the

discretion of the dispatcher (or whoever answers the phone) and were not logged. *Vineyard*, 990

F.2d at 1212.  Here, there is no allegation that complaints are not logged.  Furthermore, they are

handled under the discretion of the shift supervisor, who presumably has more training and

experience in excessive force than a telephone dispatcher.  Although Harris's theory is based on the fact that records of complaints are merely kept in each individual officer's personnel file, thus preventing one person from obtaining a "larger picture" as to the conduct of the department as a whole or a pattern of conduct with respect to an individual officer, Prattville at least keeps records of complaints and incident reports, unlike the county sheriff's department in *Vineyard*. This court finds, therefore, that the inadequate policies in terms of recordkeeping in our case do not rise to the level found in *Vineyard*.

This court's finding that Prattville's recordkeeping policies do not rise to the level of inadequacy found in *Vineyard* does not necessarily mean that they are not so inadequate as to constitute deliberate indifference.  This court does not need to analyze whether the inadequacy of Prattville's recordkeeping policy rises to the level of deliberate indifference, however, because even if it were deliberately indifferent, Harris has failed to show a sufficient causal link between the policy and the allegedly excessive force used by Davis against Harris.

To survive summary judgment on a claim of municipal liability, the plaintiff must show a "direct causal link" between the policy and the constitutional deprivation. *Canton*, 489 U.S. at 390 ("[F]ailure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable *if it actually causes injury*.") (emphasis added); *id.* at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."); *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. at 404 (to show that policy was "moving force," plaintiff "must demonstrate a directly causal link between the municipal action and the deprivation of federal rights"); *Vineyard*, 990 F.2d at 1211

17

(policy must have been the "moving force of the constitutional violation") (citations omitted).  In other words, the plaintiff must show that the inadequacy of the recordkeeping policy specifically encouraged Davis to use excessive force against Harris.  In *Vineyard*, the court pointed to expert testimony as "independent evidence" from which the jury could have found the necessary direct causal link. 990 F.2d at 1213 ("The testimony of Professor White supports the jury's finding of causation."); *id.* ("Professor White offered his opinion that these events would not have occurred if the county policies were such that officers knew they must report any confrontations, that others could call the Sheriff's Department to report complaints to the department, and that the department would investigate the complaints."); *id.* (quoting expert testimony that, without at least "the minimum policies in effect to measure [police] behavior and to address problems when they arise, then . . . it's not if abuses will occur, it's when they're going to occur . . . .").

Harris attempts but fails to provide sufficient evidence from which a reasonable juror could find that causation exists.  Harris generally cites *Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007) for the proposition that "if underlying [constitutional violations were found at the trial of the case, then the Sheriff's liability would depend on whether he failed to train adequately his officers, and whether his failure permitted or encouraged his officers['] unconstitutional conduct." (Br. in Opp. at 33.)  Even in *Bruce,* however, the court referred to whether an alleged failure to adequately train encouraged the unconstitutional conduct that allegedly occurred at search in question, not unconstitutional searches in general. *See Bruce*, 498 F.3d at 1249.

Here, Harris presents evidence tending to show that Prattville's recordkeeping policy inadequately monitors excessive force complaints against its officers, and then suggests that such inadequacy might generally encourage officers to use excessive force with impunity.  Harris

18

presents no evidence, however, as to the number of excessive force complaints filed against the department as a whole, much less any expert testimony that the numbers of complaints filed against the department is excessive.  Harris presents no expert testimony as to the importance of having all excessive force complaints brought to the Chief's attention as opposed to being handled at the supervisor level. *Contrast Vineyard*, 990 F.2d at 1212 (expert testimony that the act of logging complaints "is important for the warning such recorded complaints can provide"); *id.* (expert testimony as to why having policy and procedure manuals "give specific guidance to deputies and their supervisors about appropriate conduct and discipline or training").  Harris presents no sufficient evidence tending to suggest that Davis was encouraged by the recordkeeping policy to use excessive force, or that he was even aware how the recordkeeping policy was structured.

      Moreover, Harris presents no evidence that a more adequate recordkeeping policy would have necessarily shown enough to cause Wadsworth to be concerned about Davis; Harris cites to two incidents for which Davis was disciplined - choking a juvenile and using profanity towards two female citizens - but provides no frame of reference that gives any context as to whether Davis's disciplinary history is more frequent or more serious than those of other officers.  More importantly, Harris fails to provide any evidence or testimony showing that the incident in question would not have occurred if Prattville's recordkeeping policy had been different. *Contrast Vineyard,* 990 F.2d at 1213 (expert opinion that "these events would not have occurred" if the county's policies were different).

      In short, Harris provides insufficient evidence from which a reasonable juror could causally link Prattville's policy of keeping track of complaints to Davis's use of allegedly

excessive force against Harris, without resorting to speculation.  Without providing sufficient evidence of the necessary element of causation, summary judgment against Prattville for municipal liability is due to be GRANTED.

**B. Claims against Wadsworth (Count III)**

Wadsworth and the City of Prattville jointly move for summary judgment on the sole basis that Harris has failed to provide sufficient evidence of a municipal policy of deliberate indifference with respect to inadequate training, supervision, etc. (*See generally* Br. in Supp.; Reply Br.).  Harris's claim against Wadsworth, that he "failed to properly supervise . . . Davis and through his lack of supervision created an atmosphere that caused officers such as . . . Davis to use excessive force and to subject individuals to unconstitutional and unreasonable seizures," is based solely on his role as final policymaker for the City of Prattville. (Compl. ¶ 29.) Because, as discussed above with respect to municipal liability, Harris has failed to show sufficient evidence that the policies, however inadequate they may be, proximately caused Davis's conduct towards Harris, the element of causation is not met.  Summary judgment with respect to Harris's claims against Wadsworth in his individual capacity as final policymaker for the City of Prattville, therefore, is due to be GRANTED as well.

**C. Claims against Davis**

As stated above, Davis does not move for summary judgment as to Harris's § 1983 excessive force claim in Count I or the state law assault and battery claim (Count VI).  Davis does move for partial summary judgment, however, on the federal unreasonable seizure claim in Count I, as well as the state law malicious prosecution (Count IV) and false imprisonment (Count V) claims.  This court will discuss these claims in turn.

*1. Federal Claim - Unreasonable Seizure*

Davis asserts qualified immunity on Harris's unreasonable seizure claim, included in Count I, arguing that he was acting within the scope of his discretionary authority, that he did not violate Harris's constitutional rights, and that, if he did, the law was not clearly established. (Br. in Supp., Doc. # 28,  at 7.)

Qualified immunity "insulates government agents from personal liability for money damages for actions taken in good faith pursuant to their discretionary authority." *Calhoun v. Thomas*, 360 F. Supp. 2d 1264, 1275 (M.D. Ala. 2005) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The basic premise of the doctrine is for immunity to harbor government officials from liability unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.

To determine whether a government agent is eligible for qualified immunity, a three-part analysis, guided by Eleventh Circuit and Supreme Court precedent, is appropriate. *See Vinyard v. Wilson*, 311 F.3d 1340, 1346-47 (11th Cir. 2002). "To receive qualified immunity, the public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Vinyard*, 311 F.3d at 1346 (*quoting Lee*, 284 F.3d at 1194).  Upon satisfying the discretionary authority threshold, a two-part inquiry remains. According to the Supreme Court, the initial inquiry then is whether the facts alleged, taken in a

light most favorable to the plaintiff, demonstrate that the government official's conduct violated a constitutional right of the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). If the court finds no constitutional violation, no further inquiry is necessary. *Id.* However, "if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." *Id.* Accordingly, in determining whether to grant the present Motion for Summary Judgment, the court will apply this three-part analysis to the alleged facts of the case at bar, viewed in a light most favorable to Harris.

### *(1) Scope of discretionary authority*

First, Davis asserts that he was within his discretionary authority because, as a police corporal, he is "empowered to arrest individuals who are charged with or are violating the law." (*Id.* at 8 (*citing Crosby v. Monroe Cty.,* 394 F.3d 1328, 1332 (11th Cir. 2004)). Harris argues that disputed facts as to the parties' conduct make it a jury question as to whether Davis was engaged in a discretionary function at the time. (Br. in Resp. at 29.)

Davis provides undisputed testimony that he and Champion were dispatched to assist the officers already at the scene of the domestic disturbance. (Davis Aff. ¶ 5.) While en route to the residence, Davis claims he was advised that a certain "Kenneth Harris"[11] had outstanding warrants, and upon arriving at the scene, he observed that Hope and Hassell were attempting to confirm the warrants. (Davis Aff. ¶¶ 6-7.) Davis claims that he began "to investigate the source of the domestic disturbance and aid[] the officers at the scene in confirming the warrants issued for the arrest of Kenneth Harris." (Davis. Aff. ¶ 9.)

---

[11] *But see supra* note 3.

Harris argues that Davis gives conflicting testimony as to his function at the residence. (Br. in Resp. at 24-25.)  Harris argues that Davis "admitted that he was neither attempting to confirm the warrants, as Champion was doing that, nor was he investigating the original domestic disturbance call, because Champion was also doing that." *Id.*; (Davis Depo. 37:6-23 (stating that efforts to confirm warrants were completed by the time Davis arrived); 40:2-15 (stating that Champion was confirming warrants with dispatch and that Davis was "dealing with Ms. Harris at that time")).

Harris's argument with respect to whether Davis was performing a discretionary function is unavailing.  In determining whether an officer's acts were discretionary, courts consider whether his acts were "of a type that fell within his job responsibilities." *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  The court asks "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.* at 1265-66 (*citing Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1185 n.17 (11th Cir. 1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of his authority.")).  Whether Davis was technically involved with Champion in confirming warrants or investigating the domestic disturbance call at any particular point in time or not does not affect the undisputed fact that Davis was dispatched to the residence to assist the officers already present.  Regardless of whether Davis was investigating and confirming warrants, or aiding other officers that were doing so by "dealing with Ms. Harris," the court concludes that Davis was acting within his discretionary authority.

23

Because Davis has established that he was performing a discretionary act, Harris must demonstrate that Davis is not entitled to qualified immunity by showing that Davis violated her constitutional right to be free from unreasonable seizure and, if he did, that his actions "violated a clearly established" constitutional right of which a "reasonable government official would have been aware. . . ." *Chesser v. Sparks,* 248 F.3d 1117, 1122 (11th Cir. 2001). Keeping in mind that at this stage of the proceedings the court must base its determination of whether Harris has done so on her version of the facts, these are the relevant facts which the court will apply to the law:

After argument over the circumstances of Harris's husband being taken into custody, Davis told Harris that if she did not either calm down or go in the house he would arrest her for disorderly conduct. Harris then went into the house and, as she was closing the door, said to Davis, "F— you." After some time had passed, Davis kicked in the door and, without a warrant, arrested Harris for disorderly conduct.

*(2) Violation of constitutional right*

To defeat qualified immunity, Harris must first show that Davis violated her constitutional right against unreasonable seizure. The reasonableness of a seizure is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner,* 471 U.S. 1, 7 (1985). "Whenever an officer restrains the freedom of a person to walk away," such as during an arrest, "he has seized that person. *Id.* "A police officer may arrest a person if he has probable cause to believe that person committed a crime." *Id.*

24

"Probable cause" is defined "in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Crosby,* 394 F.3d at 1332 (11th Cir. 2004).  "Arguable probable cause" exists  "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)(internal citations omitted).   Determining arguable probable cause requires "an objective standard, asking 'whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation.'" *Id.*

Davis argues that he did not violate Harris's constitutional rights by seizing her because he had probable cause, or arguable probable cause, to arrest her for disorderly conduct.  An arrest and detention without probable cause would constitute a constitutional violation.  If that is first established, Davis would still be entitled to qualified immunity, however, if he had arguable probable cause for the arrest. *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003) ("[O]fficers who make an arrest without probable cause are still entitled to qualified immunity if there was arguable probable cause for the arrest." (internal quotations and citations omitted)).  No discussion of probable cause is necessary to this discussion because this court concludes that Davis did not have arguable probable cause to make his warrantless arrest, and therefore necessarily lacked probable cause as well.

In their briefs, the parties center their arguments around the scope of the term "abusive or obscene language" in the statute. *See* § 13A-11-7(a)(3) (1975) ("A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance, or alarm, or

recklessly creating a risk thereof, he . . . [i]n a public place uses abusive or obscene language or makes an obscene gesture . . . .").  Specifically, the parties argue over the exact point, as defined by Alabama caselaw, to which nonthreatening verbal profanities directed at police officers in the presence of third parties rise to constitute "disorderly conduct" under the statute. *See, e.g., Smith v. City of Anniston*, 668 So.2d 96 (Ala. Crim. App. 1995); *Rose v. Jackson's Gap,* 952 F. Supp. 757, 764 (M.D. Ala. 1996) (Dement, J.); *H.N.P. v. State*, 854 So.2d 630, 632 (Ala. Crim. App. 2003) (per curiam); *Robinson v. State*, 615 So.2d 112, 114 (Ala. Crim. App. 1993), *superseded by statute on other grounds, Fallin v. City of Huntsville,* 865 So.2d 473 (Ala. Crim. App. 2003).

Even if Alabama case law, as presented by the parties, is unclear regarding the degree of nonthreatening profanity directed towards police officers sufficient to constitute disorderly conduct in the presence of third parties, and this court does not necessarily find that it is unclear, there was no arguable probable cause in this situation because of important distinguishing facts, given Harris's version of events: (1) by entering the residence, Harris complied with Davis's orders to either stop cursing or enter the residence, and (2) that Davis did not place Harris under arrest until *after* she had complied with his order to enter the residence, by busting down her door and arresting her without a warrant.

"The sanctity of the home is afforded special protection under the *Fourth Amendment*, such that 'the reasons for upholding warrantless arrests in a public place do not apply to warrantless invasions of the privacy of the home.'" *Bashir v. Rockdale Cty., Ga.,* 445 F.3d 1323, 1327 (11th Cir. 2006) (*quoting Payton v. New York*, 445 U.S. 573, 576 (1980)). "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Bashir*,

445 F.3d at 1328.  Viewing these particular facts and circumstances in the light most favorable

to Harris, the court concludes that, under Plaintiff's version of the facts, Davis did not have

arguable probable cause, after Harris had complied with his order to stop cursing or go inside,

to subsequently and forcefully enter her house without a warrant and to arrest her for disorderly

conduct. *See J.S. v. Campbell*, 2006 U.S. Dist. LEXIS 72943, at *18-*20 (M.D. Ala. 2006)

(Watkins, J.).  Moreover, Davis has not shown that exigent circumstances existed that would

justify his warrantless arrest. *McClish v. Nugent*, 483 F.3d 1231, 1240-41 (11th Cir. 2007)

(listing examples of exigent circumstances excusing warrantless entries as breaking up violent

fight, preventing destruction of evidence, putting out fire in burning building, pursuing fleeing

suspect, rescuing kidnapped infant, attending to stabbing victim) (internal citations omitted).

      Alternatively, Davis argues that he had arguable probable cause to arrest Harris for the

related charges of "obstruction of governmental operations" or "refusal to obey a lawful police

order." *See* Ala. Code § 13A-10-2 (1975) (obstruction of governmental operations); Prattville

Municipal Code § 1-9 (refusal to comply with lawful police order).  The law of this circuit

holds that "when a crime under which the arrest is made and a crime for which probable cause

exists are in some fashion related, then there is no question but that there is a valid arrest." *Mills

v. Wainwright*, 415 F.2d 787, 790 (5th Cir. 1969)[12]; *see also United States v. Atkinson*, 450 F.2d

835, 838 (5th Cir. 1971); *Babers v. City of Tallassee*, 152 F. Supp.2d 1298, 1309-1310 (M.D.

Ala. 2001) (Albritton, C.J.)(citing several cases for proposition that even if officer had no

---

    [12]  In *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit
adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October
1, 1981.

probable cause to arrest for the crime charged, he may be entitled to qualified immunity if there is proof of probable cause for a closely related offense).

Even assuming that "obstruction of a governmental operations" and "refusing to obey a lawful police order" are "closely related" to disorderly conduct, this court finds no arguable probable cause, under Harris's facts, for the same reason that it finds no probable cause for disorderly conduct.  Davis did not arrest Harris until after she had complied with his order to either calm down, or enter the residence, or be arrested.  So, there was no refusal to comply with a lawful order.  Once she was in the house, he needed either a warrant or probable cause plus exigent circumstances to enter the house and arrest Harris for obstruction of governmental operations.  There was no warrant and there were no exigent circumstances.  Davis therefore had no arguable probable cause to arrest Harris in her home for obstruction.

Because Davis arrested Harris without probable cause or even arguable probable cause, this court finds that, according to her version of events, Harris's  constitutional right to be free from unreasonable seizure was violated.

*(3) Clearly established law*

Although Alabama law may or may not be clear concerning the precise contours of disorderly conduct, if Harris complied with Davis's order, after his first request, to either calm down, or enter the residence, or be arrested, it would have been clear to the reasonable officer that Davis had no arguable probable cause to then crash into the house and arrest Harris for

disorderly conduct without a warrant when she chose the second of his three proffered alternatives.[13]

This court is not informed of any case law that is clearly on point factually: where a defendant, having engaged in profane but non-threatening language towards police officers, not typically sufficient to constitute "fighting words" but in the presence of bystanders who were "visibly disturbed" according to the officers, complies with an officer's directive to enter her residence (after cursing once more) and is then arrested in her residence. The requirements of warrantless arrests as discussed above, however, are well-settled, and it would be clear to the reasonable officer, even if he did have probable cause, that no exigent circumstances existed.

Similarly, under the facts of this case, it was clearly established that there was no arguable probable cause for the two related offenses that Davis suggests. It would be clear to the reasonable officer that there is no probable cause to arrest  for obstruction of governmental operations someone trying to assist in the confirmation of a warrant. Similarly, the reasonable officer could not expect to have arguable probable cause to arrest an individual for refusal to obey an order directly after the individual, in fact, obeyed his order.

*b. Qualified immunity summary*

---

[13]  This court reiterates that it restricts its finding to the particular facts and circumstances as presented by Harris. According to Harris, she was told once to go in the house, to which she responded, "I'm going." (Harris Depo. 180:4-8.)  Harris denied being told several times to stop cursing. (Harris Depo. 181:14-182:2.)  Moreover, she waited until she was inside the house and right before shutting the door that she told him, "F— you."(Harris. Depo. 182:14-21.). According to this set of facts, Harris "had not done anything that would give a reasonable officer the impression that [Harris] was violating, had violated, or was about to violate" the disorderly conduct statute. *Brown v. Head*, 228 F. Supp. 2d 1324, 1328-29 (M.D. Ala. 2002) (Albritton, C.J.)  The court wishes to emphasize that the law may not be clearly established in other circumstances in which an individual argues with a police officer while complying with his orders, or is given an order multiple times before eventually complying.

Because Davis had neither probable cause nor arguable probable cause to arrest Harris in her home without a warrant after she had complied with his request to enter her home, his conduct was unreasonable and violated her Fourth Amendment rights.  The clear lack of either arguable probable cause or exigent circumstances in this case applies not only to the offense of disorderly conduct, but also to any allegedly related offenses raised by Davis, and defeats any qualified immunity defense for purposes of summary judgment.  Accordingly, there are genuine issues of material fact with respect to Harris's unreasonable seizure claim, and Davis's motion for summary judgment with respect to that claim is due to be DENIED.

State Claims: False Imprisonment and Malicious Prosecution.

Davis moves for summary judgment with respect to Harris's state law claims of false imprisonment and malicious prosecution on the same theory - that he had probable or arguable probable cause to arrest her for disorderly conduct or the related offenses of (1) obstruction of governmental operations or (2) refusal to comply with a lawful police order. (See Br. in Supp. at 3.)  He also claims state law immunity for his discretionary acts as a police officer, arguing that Harris has failed to show that he acted in bad faith, willfully, or with malice in his actions. *Id.*

The doctrine of state law discretionary, or State-Agent, immunity has evolved in recent years.  Alabama statutory law provides that municipal police officers "shall have immunity from tort liability arising out of [their] conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a); *see Sheth v. Webster,* 145 F.3d 1231, 1237 (11th Cir. 1998).  In 2000, *Ex parte Cranman* referred to the immunity available to individual defendants sued for actions taken on behalf of the State as "State-Agent" immunity – and set up a similar restatement of the rule governing State-agent

30

immunity. 792 So.2d 392, 405 (Ala. 2000); *Ex parte Butts*, 775 So.2d 1732 (Ala. 2000) (adopting *Ex parte Cranman*'s "restatement" of the law of State-Agent immunity).[14]  Under either the § 6-5-338 or the *Ex Parte Cranman* formulation, immunity will be denied for acts of bad faith, malice or willfulness. *Hamilton v. City of Jackson*, 508 F. Supp. 2d 1045, 1059 (S.D. Ala. 2007) (*quoting Vaughn v. City of Athens,* 176 Fed. Appx. 974, 978 (11th Cir. Apr. 20, 2006)); *Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000) ("[A] state agent *shall not* be immune from civil liability in his or her personal capacity . . . when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.").

In *Borders v. City of Huntsville*, the Alabama Supreme Court examined discretionary or State-Agent immunity in the context of a decision by a peace officer to make a warrantless arrest. 875 So.2d 1168 (Ala. 2003).  The *Borders* court recognized that arrests and attempted arrests are classified as discretionary functions. *Id.* at 1178.  The court examined, for the first time, the situation found in the instant case: "whether a peace officer making a warrantless arrest on a charge based upon conduct the officer witnessed is entitled to discretionary-function immunity in a subsequent civil action after the arrestee is acquitted.." *Id.* at 1179.  Recognizing the tension between good-faith but mistaken acts, which are entitled to discretionary immunity, and bad-faith, malicious acts, which are not, the *Borders* court held that "the standard of 'arguable probable cause' should govern in this case." *Id.* at 1179-80.  Under the "arguable

---

[14]  Specifically and in relevant part, the *Ex Parte Cranman* court held that state agents are immune from liability in their personal capacity when the conduct is based on the agent's "exercising judgment in the enforcement of the criminal laws of the State, including but not limited to, law-enforcement officers' arresting or attempting to arrest persons."

probable cause" standard, therefore, the court must ask whether, construing the evidence in the light most favorable to the plaintiff, "no reasonable police officer could have believed that he had probable cause to arrest." *Id.* at 1180. The *Borders* court, viewing the evidence in the light most favorable to the arrestee, could not say as a matter of law that the officer had arguable probable cause to arrest because of the disputed evidence of the events leading up to the arrest, and denied the officer discretionary immunity, and therefore summary judgment, on the unlawful arrest charge. *Id.* at 1181.[15]

As the court found above in its discussion of Harris's federal unreasonable seizure claim, this court finds that Davis has no arguable probable cause to arrest Harris in her home, without a warrant, for any of the proffered offenses. Without arguable probable cause, therefore, Davis is not entitled to discretionary or State-Agent immunity. *See Borders*, 875 So.2d at 1181-82 (finding no arguable probable cause when evidence of events leading up to arrest was disputed); *Franklin v. City of Huntsville,* 670 So.2d 848, 853 (Ala. 1995) (finding disputed facts such as whether arrestee was cursing and attracting attention of other spectators and whether he was standing in unauthorized zone presented jury question as to probable cause that precluded summary judgment).

Even though Davis lacks the privilege of State-Agent immunity on these claims, the court must still examine each state law claim to ensure that Harris has provided sufficient evidence to withstand summary judgment. This court will therefore examine each claim in turn.

---

[15] The *Borders* court did, however, affirm summary judgment on the malicious prosecution charge, because the plaintiff disclaimed in his reply any malice or intentional conduct on the officer's part, and one of the necessary elements of a malicious prosecution claims is that the defendant instigated the prior judicial proceeding "without probable cause and with malice." *Id.* at 1182 (citations and quotations omitted).

32

*Unlawful Imprisonment*

Section 6-5-170 of the Alabama Code defines "false imprisonment" as "the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170 (1975). In Harris's complaint, she alleges that Davis "handcuffed the Plaintiff Kelli Harris and held her against her will, prohibiting her movement and imprisoning her without even arguable probable cause to do so." (Compl. ¶ 39.) If a police officer has no arguable probable cause under the Fourth Amendment to arrest a plaintiff without a warrant for disorderly conduct, no probable cause exists for purpose of plaintiff's state law claim for false imprisonment. *Stovall v. Allums,* 2005 U.S. Dist. LEXIS 29146, at *41 (M.D. Ala. Aug. 16, 2005)(Alabama's standard for probable cause is the same as the federal standard); *cf. Nesmith v. Alford*, 318 F.2d 110, 122 (5th Cir. 1963) (Alabama probable cause standard for malicious prosecution claim equals federal standard). This court has already found, in its discussion of Harris's federal claim of unreasonable seizure, that, under Harris's version of events, Davis had no arguable probable cause to arrest her for disorderly conduct or any other closely related offense. Therefore, Davis's motion for summary judgment with respect to Harris's unlawful imprisonment claim is due to be DENIED.

*Malicious prosecution*

To establish a claim of malicious prosecution, Harris must prove that Davis "instigated without probable cause and with malice, a prior judicial proceeding against [Harris], and that the prior proceeding ended in favor of [Harris], and that [Harris] suffered damages." *Willis v. Parker,* 814 So.2d 857, 863 (Ala. 2001); *Delchamps, Inc. v. Bryant,* 738 So.2d 824, 831-32 (Ala. 1999). It is not disputed that Davis initiated the prosecution of Harris for disorderly

33

conduct and that she was ultimately found not guilty of the offense.  Instead, Davis argues that

he had arguable probable cause, and that Harris cannot show that Corporal Davis acted with bad

faith, malice or willfulness. (*See* Br. in Supp. at 21.)  For purposes of analyzing a malicious

prosecution claim against an arresting officer, "[t]here is no reason to distinguish between [an]

arrest and [the] act of instituting the criminal proceedings against [plaintiff]" shortly thereafter

for the same offense. *Walker v. Briley*, 140 F. Supp.2d 1249, 1264 (N.D. Ala. 2001).

As discussed previously, Davis had no probable cause or arguable probable cause to

arrest Harris in her home without a warrant. *Nesmith v. Alford*, 318 F.2d 110, 122 (5th Cir.

1963) (federal probable cause standard equals state probable cause standard for malicious

prosecution).  To survive summary judgment on her malicious prosecution claim, however,

Harris must also provide sufficient evidence to show a genuine issue of material fact as to

whether Davis acted with malice. *Willis,* 814 So.2d at 863 ("without probable cause *and* with

malice") (emphasis added).  Harris argues that "malice is indicated in the degree of force he

used, once he arrested the Plaintiff, and the punishment he exerted upon her, knowing that she

had shoulder injuries, picking her up by the arms from behind her back while handcuffed, and

also his malice is indicated in the false report he made concerning the Plaintiff's actions at the

hospital." (Br. in Resp. at 29.)

The totality of the circumstances, including the amount of force used by Davis in

arresting Harris, including breaking down the door to make a warrantless arrest, and detaining

Harris,  may be indicative of his state of mind in doing so, and also relevant to determine that he

had malice in deciding to instigate Harris's prosecution for disorderly conduct.  Similarly,

although the alleged contradiction between the tape transcripts and the incident report involved

34

a subsequent incident that occurred at the hospital, and not the previous incident in which Harris was arrested, that evidence might be considered in determining Davis's state of mind in detaining and then instigating the prosecution of Harris for disturbing the peace.

Furthermore, this court finds that a genuine issue exists as to whether or not Davis arrested, detained and prosecuted Harris with malicious intent because of the fact that he arrested her after she complied with his order to enter the residence.  As Harris's version of the facts go, Davis told her *once* to enter the residence, to which she replied, "I'm going," and began to head towards her door, arguing with Davis all the while.  Right before shutting the door and thus completing her compliance with his demands, she yelled, "F— you!"  At this point, Davis decided to arrest Harris, and began to break down her door.  Because, as discussed above, under Harris's version of events, Davis did not even have arguable probable cause to arrest Harris, his actions under the circumstances create a genuine issue of material fact as to whether his decisions to arrest, detain, and prosecute Harris were made with bad faith, malicious intent, or willfulness. *See Sheth v. Webster,* 145 F.3d 1231, 1238-39 (11th Cir 1998) (holding that to deny discretionary immunity under § 6-5-338, plaintiff must show that defendants acted "in bad faith, with malice or willfulness"); *Reed v. Brunson,* 527 So.2d 102, 119 (Ala. 1988) ("'Wilfulness' is the conscious doing of some act or omission of some duty under knowledge of existing conditions accompanied with a design or purpose to inflict injury."); *Empiregas, Inc. v. Feely,* 524 So.2d 626, 628 (Ala. 1988) (defining legal malice as "the intentional doing of a wrongful act without just cause or excuse, either with an intent to injure the other party or under such circumstances that the law will imply an evil intent."); *In re Sheffield*, 465 So.2d 350, 359 (Ala. 1984) (adopting Black's Law Dictionary definition of bad

35

faith as "contemplat[ing] a state of mind affirmatively operating with furtive design or ill will."). Specifically, it creates a genuine issue of material fact as to whether Davis arrested, detained, and prosecuted Harris (1) because he subjectively believed (albeit unreasonably and without arguable probable cause) that he had probable cause to do so; or (2) out of anger and retaliation for Harris's remarks.

Because this court finds that Davis had no arguable probable cause to arrest, detain, and prosecute Harris, and because there exists a genuine issue of material fact as to whether Davis acted with malice, summary judgment with respect to Harris's malicious prosecution claim is due to be DENIED.

## V. **CONCLUSION**

For the foregoing reasons, the court hereby ORDERS that:

(1) Prattville's Motion for Summary Judgment on the basis of a lack of policy or custom is GRANTED.

(2) Wadsworth's Motion for Summary Judgment is GRANTED.

(3) Davis's Motion for Partial Summary Judgment on Harris's claims of unreasonable seizure, false imprisonment, and malicious prosecution, is DENIED.

(4) This case shall proceed on Harris's Fourth Amendment claims against Davis for unreasonable seizure and excessive force, and on Harris's state law claims against Davis for assault and battery, malicious prosecution, and false imprisonment.

(5) In light of the grant of summary judgment against Prattville and Wadsworth, Davis's Motion to Bifurcate (Doc. # 30), in which Prattville and Wadsworth joined (Doc. # 35) is DENIED as moot.

Done this 7th day of July, 2008.

/s/ W. Harold Albritton
W.  HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE